## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS

| | |
|---|---|
| **WESTERN EXPRESS, INC.,** ) | |
| **MHT GROUP, INC., and** ) | |
| **CHURCH TRANSPORTATION &** ) | **Case No. 2:24-cv-2139** |
| **LOGISTICS, INC.,** ) | |
| ) | **JURY DEMANDED** |
| *Plaintiffs,* ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **COLTON AHMAD CATHEY,** ) | |
| **Individually and d/b/a CAC** ) | |
| **OPERATIONS, LLC; CAC** ) | |
| **OPERATIONS, LLC, d/b/a A-1's** ) | |
| **XCLUSIVE AUTO AXA, LLC, A-1's** ) | |
| **TOWING & HAULING, LLC, A1's** ) | |
| **XCLUSIVE AUTO, A1'S CAR** ) | |
| **HAULING, LLC, A-1's HOUSE, A-1's** ) | |
| **APLEX MEMPHIS, and ACORD** ) | |
| **SECURITY; S-LINE, LLC d/b/a** ) | |
| **S-LINE TRUCK PARKING; and** ) | |
| **JOHN DOES 1-10,** ) | |
| ) | |
| *Defendants.* ) | |

## COMPLAINT FOR DAMAGES

Plaintiffs, Western Express, Inc., MHT Group, Inc., and Church Transportation & Logistics, Inc., by and through their counsel of record, Glassman, Wyatt, Tuttle & Cox, P.C., pursuant to the Federal Rules of Civil Procedure, hereby file the following Complaint for Damages against Defendants Colton Ahmed Cathey, Individually and doing business as CAC Operations, LLC; CAC Operations, LLC, doing business as (alternatively) A-1's Xclusive Auto AXA, LLC, A-1's Towing & Hauling, LLC, A-1's Xclusive Auto, LLC, A-1's Car Hauling,

LLC  A-1's House, A-1's Aplex Memphis  and/or Acord Security; S-Line, LLC, d/b/a S-Line Truck Parking; and John Does 1-10, and for their causes of action, Plaintiffs state as follows:

## PARTIES, JURISDICTION AND VENUE

### *The Plaintiffs*

1.    Plaintiff Western Express, Inc. ("Western Express") is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

2.    Plaintiff MHT Group, Inc. ("MHT") is an Illinois corporation with its headquarters in Westmont, Illinois.

3.    Plaintiff Church Transportation & Logistics, Inc. ("CTL") is an Alabama corporation with its principal place of business in Birmingham, Alabama.

4.    At all times relevant to this Complaint, each of the Plaintiffs were/are engaged in interstate commerce through the provision of commercial motor carrier transportation services.

### *The Defendants*

5.    Defendant Colton Ahmad Cathey ("Cathey") is and was at all times relevant to this Complaint a resident of Shelby County, Tennessee and, through the use of his alter egos, namely: Defendants CAC Operations, LLC, A1's Xclusive Auto AXA, LLC, A-1's Towing and Hauling, A-1s Xclusive Auto, A1's House, LLC, Acord Security (sic), and other assumed names as may be more fully revealed during the discovery of this cause, engaged in profit-seeking interstate

enterprises including, *inter alia*, the offering of "security services" and towing/hauling of commercial motor vehicles.

6.    Upon information and belief, Cathey may be served with process at 160 W. Mallory Avenue, Memphis, Tennessee 38109 or at his alternative addresses of 3481 Lakeside TS 5 Dr., Atlanta, GA 30326 and/or 1960 N. Parkway, Apt. 1300, Memphis, Tennessee 38112.

7.    Defendant CAC Operations, LLC ("CAC") is and was at all times relevant to this Complaint a Tennessee Limited Liability Company with its principal place of business located at 160 W. Mallory Avenue, Memphis, Tennessee 38109.

8.    CAC may be served with service of process via its registered agent, listed with the Tennessee Secretary of State as Registered Agents, Inc., 116 Agnes Road, Ste. 200, Knoxville, TN 37919.

9.    During the time period relevant to this Complaint, CAC engaged in interstate business commerce and otherwise did business as, or interchangeably under the assumed names of, *inter alia,* "A1's Xclusive Auto AXA, LLC," "A-1's Towing and Hauling, LLC" "A-1s Xclusive Auto," "A1's Car Hauling, LLC," "A1's House, LLC," "A-1s Aplex Memphis," "Acord Security," and other alleged "corporate entities" as set forth in greater detail herein and as may be more fully uncovered during the course of discovery in this cause.

10.    The sole member and owner of CAC at all times relevant to this Complaint was Defendant Cathey, who used CAC and its various assumed names as his alter ago for the events and circumstances described herein.

11.    Defendant A-1's Xclusive Auto AXA, LLC (hereinafter "A-1's Xclusive") was, at times relevant to this Complaint, registered as a Tennessee Limited Liability Company with its principal place of business located at 160 W. Mallory Avenue, Memphis, Tennessee 38109.

12.    At all times relevant to this Complaint, Defendant A-1's Xclusive has purported to operate in interstate commerce pursuant to its Federal Motor Carrier Safety Administration License No. MC-01390839 and Department of Transportation No. 3211701 in engaging in towing services for a variety of vehicle types, including commercial motor vehicles.

13.    Upon information and belief, Defendant A-1's Xclusive was formally renamed "CAC Operations, LLC" on or about February 20, 2017 through the Tennessee Secretary of State; however, upon information and belief, sole member and owner of Defendant A-1's Xclusive, Defendant Cathey, continued to use the alias of and otherwise do business as Defendant A-1's Xclusive at all times relevant to this Complaint in order to continue to utilize the FMCSA license and DOT No. referenced above.

14.    Upon information and belief, Defendant A-1's Xclusive may be served with service of process via its registered agent, listed with the Tennessee Secretary of State as: Registered Agents, Inc., 116 Agnes Road, Ste. 200, Knoxville, TN 37919.

15.    Defendant A1's House, LLC, d/b/a A1's Aplex Memphis ("A1s Aplex"), was originally a for-profit Tennessee Limited Liability Company with its

principal place of business located at 160 W. Mallory Avenue, Memphis, Tennessee 38109.

16.     Upon information and belief, although A1s Aplex was administratively dissolved by the Tennessee Secretary of State on or about August 6, 2019, Defendant Cathey has nevertheless continued, at all times relevant to this Complaint, to use the assumed identity of Defendant A1s Aplex to engage in ongoing interstate commerce engaging in, *inter alia*, towing and hauling services, despite the administrative dissolution of the company in direct violation of Tennessee law.

17.     Defendant A1s Car Hauling, LLC ("A1s Car Hauling"), was originally a for-profit Tennessee Limited Liability Company with its principal place of business located at 160 W. Mallory Avenue, Memphis, Tennessee 38109.

18.     Upon information and belief, A1s Car Hauling may be served with service of process through its registered agent: Sherea Mitchell, at 5019 Cashmere Cove, Memphis, Tennessee 38125-4758.

19.     Upon information and belief, at all times relevant to this Complaint, Defendant A1s Car Hauling has purported to operate in interstate commerce pursuant to its Federal Motor Carrier Safety Administration License No. MC-1099112 and Department of Transportation No. 3409773.

20.     Upon information and belief, although Defendant A1s Car Hauling was dissolved by the Tennessee Secretary of State on or about March 12, 2020, Defendants Cathey and CAC have nevertheless continued, at all times relevant to this Complaint, to use the assumed identity of Defendant A1s Car Hauling to

engage in ongoing interstate commerce engaging in, *inter alia*, towing and hauling services using the FMCSA license and DOT No. referenced herein.

21.     Defendant A1's Towing and Hauling, LLC ("A1s Towing") is in actuality an assumed name held and used by Defendant CAC, with its principal place of business located at 160 W. Mallory Avenue, Memphis, Tennessee 38109. Upon information and belief, A1s Towing may be served with service of process via its registered agent, listed with the Tennessee Secretary of State as: Registered Agents, Inc., 116 Agnes Road, Ste. 200, Knoxville, TN 37919.

22.     At all times relevant to this Complaint, Defendants Cathey and CAC used the assumed and fictitious names listed herein in interstate commerce in, *inter alia*, the States of Mississippi, Tennessee, and Arkansas during the relevant time period described herein, including but not limited to the years of 2022 through the present, and did so while engaged in the business of interstate commerce through the guise of commercial wrecker/towing and storage services within those States.

23.     Defendant S-Line, LLC ("S-Line") is and was at all times relevant to this Complaint a Tennessee Limited Liability Company operating one or more storage/parking facilities and/or property management services within the State of Tennessee.

24.     S-Line also does business within the State of Tennessee under the assumed name of "S-Line Truck Parking."

25.     S-Line's headquarters is located in Knoxville, Tennessee. It may be served with process via its registered agent, listed with the Tennessee Secretary

of State as: Registered Agents, Inc., 116 Agnes Road, Ste. 200, Knoxville, TN 37919.

26.    At all times relevant to this Complaint, Defendant S-Line was engaged in the business of providing security and parking services to business owners within *inter alia* the States of Mississippi, Tennessee and Arkansas who wished to offer paid parking to interstate commercial truck drivers.

27.    At all times relevant to this Complaint, Defendant S-Line was engaged in the business of interstate commerce through the guise of providing commercial parking to interstate commercial truck drivers and their employers, like the Plaintiffs, and the provision of "parking and security services" to third party businesses likewise engaged in interstate commerce through the provision of services to interstate commercial truck drivers and their employers, like the Plaintiffs.

28.    Upon information and belief, Defendant Cathey is and was at all times relevant to this Complaint an owner and/or managing member of Defendant S-Line.

29.    Upon information and belief, Defendant Cathey, acting individually and/or as Defendant CAC or one or more of CAC's assumed names, in conjunction with Defendant S-Line and one or more third parties, whose identities are presently unknown but expected to be uncovered during the discovery process in this matter but are hereafter referred to as John Does 1-10, engaged in a conspiratorial enterprise in direct violation of multiple local, state, and federal laws whereby Defendant S-Line, in deliberate agreement and

concerted efforts with the other named Defendants to this action, predatorily lured and entrapped commercial truck drivers and their vehicles, like those owned by the Plaintiffs, while Plaintiffs were engaged in interstate commerce, at which point Defendant S-Line, acting in conspiracy with Defendant Cathey, CAC, CAC's assumed/fictitious alter egos, and John Does 1-10, through the use of both the threat of and at times the actual use of unlawful force, subsequently proceeded to illegally harass, intimidate, assault, batter, hijack, and/or hold hostage Plaintiffs' vehicles, property, and/or Plaintiffs' employees/agents until Plaintiffs paid as ransom to the Defendants exorbitant and unlawful "debts" for their release.

30.    Jurisdiction is appropriate before this Honorable Court pursuant to the provisions of 28 U.S.C. § 1331 and specifically 18 U.S.C. § 1964(a) and (c) of the Racketeer Influenced and Corrupt Organization ("RICO") Act, Title IX of the Organized Crime Control Act of 1970, with an amount in controversy in excess of the requisite jurisdictional limits.

31.    Supplemental jurisdiction over the state law claims herein is conferred upon this Court by 28 U.S.C. § 1367(a).

32.    Venue is proper before the United States District Court for the Western District of Tennessee, Western Division, pursuant to 28 U.S.C. § 1391, as at least one of the Defendants is a corporation organized and existing, with a principal place of business in Memphis, Tennessee, and a substantial portion of the acts and/or omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

*The Scheme*

33.    Plaintiffs incorporate each of the preceding paragraphs and allegations contained therein by reference as if fully set forth herein.

34.    Upon information and belief, Defendants Cathey and/or CAC, under the alias of or otherwise doing business as *inter alia,* "A1's Xclusive Auto AXA, LLC," "A-1's Towing and Hauling, LLC" "A-1s Xclusive Auto," "A1's Car Hauling, LLC," "A1's House, LLC," "A-1s Aplex Memphis," and/or "Acord Security" entered into a contract with the City of Memphis and other local governments in the State of Tennessee for the provision of commercial wrecker/towing services.

35.    These same Defendants further purport to "offer" such services in other states, including the State of Arkansas.

36.    Upon information and belief, in conjunction with such "services," Defendants Cathey and/or CAC, under the alias of or otherwise doing business as *inter alia,* "A1's Xclusive Auto AXA, LLC," "A-1's Towing and Hauling, LLC" "A-1s Xclusive Auto," "A1's Car Hauling, LLC," "A1's House, LLC," "A-1s Aplex Memphis," and/or "Acord Security," utilized the FMCSA licenses and DOT numbers as referenced hereinabove.

37.    Upon Information and belief, Defendant S-Line contracted with multiple third-party businesses in and around the City of Memphis, the State of Tennessee generally, and others to provide security and/or "parking services" to such businesses. These businesses typically took the form of entities running gas/service stations and/or paid parking lots frequented by commercial truck

drivers engaged in interstate commerce, such as those drivers employed by each of the Plaintiffs.

38.     These third-party businesses either provided for the reasonable free parking for the business's customers, including commercial truck drivers, or otherwise allowed for such commercial drivers frequenting the business's premises to pay a fee, allowing the driver to then legally park for a specific period. During the relevant time referenced herein, Defendant S-Line was responsible for collecting the payments for paid parking at more than one such third-party business.

39.     In addition, Defendant S-Line engaged in a pattern and practice of creating the appearance of open parking in certain areas within the State of Tennessee which were adjacent to major truck stops and/or convenience markets, in the effort to lure commercial truck drivers, like the Plaintiffs' respective drivers and other commercial truck drivers, into parking in such areas as the drivers utilized the services of the truck stops/convenience markets.

40.     In so doing, Defendant S-Line would deliberately and deceptively either fail to post the property as being private and/or off-limits for parking by the drivers or would otherwise post signage intended to deceive the drivers into believing that if the requested fee was paid, the driver would be permitted to park there for a specified period of time.

41.    An example of such signage includes, but is not limited to:





42.    However, by at least October of 2022, Defendants Cathey, CAC and

S-Line conspired together to create an illegal and unjust interstate enterprise,

whereby Defendant S-Line, utilizing its access to these third-party businesses under the guise of providing security and "parking services," would lure and trap unsuspecting commercial truck drivers, creating deceptive parking areas for such drivers and their vehicles, and then regardless of the propriety and legality of the commercial truck driver's parking in the space, S-Line would contact Defendants Cathey and CAC to have the commercial vehicle unlawfully booted and/or towed from the premises.

43.    S-Line, working in common concert with Defendants Cathey, CAC, CAC's assumed/fictitious alter egos, and/or John Does 1-10, would then proceed to predatorily target the commercial truck drivers and their equipment for alleged "unpaid parking fees," illegally booting, towing, and in multiple instances "storing" the driver's vehicle in direct contravention of the applicable law(s).

44.    By way of example, Defendant S-Line would predatorily wait until a commercial truck driver pulled into a service/convenience station, temporarily and lawfully parked, and went inside the station to make a purchase as a legal invitee of the business owner. While the driver was inside the business, S-Line would contact employees, agents, and/or representatives of Defendants Cathey and/or CAC and have them appear to boot and subsequently tow the commercial vehicle from the premises in direct violation of both Memphis City Ordinances and Tennessee law.

45.    Other times, Defendant S-Line would intentionally and predatorily entrap commercial truck drivers by posting signage either indicating that an area

was appropriate for free parking by the commercial truck driver or otherwise that the fee was one price to park for a given amount of time, taking payment of the posted fee, and then nevertheless contacting employees, agents, and/or representatives of Defendants Cathey and/or CAC to have the same vehicles booted and/or towed.

46.    In the event that a parking fee was charged, it was paid in accordance with S-Line's explicit posted instructions, such as those posted on the example below, which required that the driver tender such fee through the use of online/electronic bill pay services, including but not limited to online credit card payments, Apple Pay, Google Pay, and/or the use of QR codes:



47.    On several occasions, the employees, agents, and/or representatives of Defendants Cathey and/or CAC, frequently using the assumed name of "A1s Towing and Hauling" would quite literally trap the commercial truck drivers and their vehicles in the lot to prevent them from leaving the premises, for example, by physically using the Defendants' own vehicles to "block in" the commercial

truck driver and/or his/her vehicle, or even attempting to sabotage or otherwise actively dismantle parts of the driver's vehicle.

48. These same employees, agents, and/or representatives of Defendants Cathey and/or CAC, often wearing bullet proof vests, guns, and at times even carrying "badges" purporting to convey their "legal authority" over the truck driver and the premises, would then attempt, through the use of extortion, intimidation, threats of bodily harm and at times, outright assault and battery, to force the truck driver to allow Cathey and CAC, doing business under its numerous assumed names, access to the vehicle so as to tow it from the third-party's property, or otherwise pay to the Defendants exorbitant sums of money to escape.

49. More specifically, once a commercial driver pulled onto the third-party's premises, S-Line would contact the other Defendants to come to the premises, even where the commercial truck driver had clearly lawfully parked in order to frequent the third-party business and make a purchase or already paid for the parking space/time in accordance with S-Line's posted instructions.

50. Agents, representatives, and/or employees of Defendants would then approach the driver and advise that his or her vehicle was to be "booted" unless the driver immediately tendered monies far in excess of the lawful amount permitted under the applicable law. In the alternative, these same agents, representatives and/or employees of Defendants would simply predatorily boot the driver's vehicle first, without warning or authorization, and then subsequently attempt to intimidate, coerce, harass, or threaten the driver or

vehicle with harm unless the driver immediately tendered monies far in excess of the lawful amount permitted under the applicable law.

51.    Even if the commercial driver then agreed to pay the illegal "fines," those same agents, representatives, and/or employees of the Defendants would subsequently increase the amount demanded as "payment" in an effort to extort even more money.

52.    Meanwhile, or shortly thereafter, and regardless of the commercial driver's attempts at compliance, agents, employees and/or representatives of Defendants Cathey and/or CAC would illegally tow the vehicle from the scene and take it to one or more "storage facilities" owned and/or operated by Defendants Cathey and/or CAC – sometimes with the commercial driver still held hostage inside the vehicle, at others leaving the commercial driver stranded with no means of transportation.

53.    Once at the Defendants' "storage facilities," agents, representatives, and/or employees of Defendants Cathey and/or CAC would then attempt to extort still more monies from the driver and the driver's employer, demanding that they pay exorbitant and arbitrary amounts for the booting, towing, and storage of the vehicle.

54.    Again, even if the driver/employer agreed to pay these additional "charges," and even upon receipt of payment of those charges, Defendants would frequently further delay the release of the towed vehicle to further drive up still more purported "storage fees" and other alleged "costs" and extort additional monies from the driver/employer.

55.    Defendants demanded that these "charges"/"costs" likewise be tendered to them from their victims electronically, via check, wire, credit card or other form of electronic payment, typically using the alias/alter ego of "A1's Towing," "A1's Towing and Hauling," and/or "A1s Xclusive Auto."

56.    In furtherance of this enterprise/scheme, Defendants further engaged in a pattern and practice of refusing to send any invoice to purportedly substantiate the alleged "charges" unless and until the extorted amount demanded as "payment" was paid in full, again in direct violation of the applicable laws.

57.    Only after the extorted monies were paid in full would Defendants, typically Defendants Cathey and CAC, using the alias/alter ego of "A-1s Towing," or "A1's Towing and Hauling," finally produce an "invoice," which Defendants would then transmit, using either electronic and/or U.S. Mail, to the commercial driver's employer to purportedly "substantiate" the arbitrary, grossly inflated and unlawful amounts charged.

58.    Upon information and belief, Defendants then shared in the illicit, illegal, and fraudulently obtained monies received from the Plaintiffs and other similarly situated members of the general public, including but not limited to funneling some portion of such unlawfully obtained monies into the "businesses" of CAC (including but not limited to the funneling of such monies into the "businesses" operated under CAC's assumed names of "A1's Xclusive Auto AXA, LLC," "A-1's Towing and Hauling, LLC" "A-1s Xclusive Auto," "A1's Car Hauling,

LLC," "A1's House, LLC," "A-1s Aplex Memphis," and/or "Acord Security"),  S-Line, and/or John Does 1-10.

59.    As a result of the outrageous conduct and illegal acts by the Defendants, Plaintiffs have collectively incurred significant and substantial damages in excess of the jurisdictional requirement of this Court.

*Specific Examples of the Scheme*

60.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

61.    The following allegations of specific instances of the outrageous conduct and illegal acts by the Defendants in the furtherance and execution of their unlawful conspiracy and enterprise are by no means exhaustive, as Defendants' unlawful activities remain ongoing to date, but instead are provided herein simply as a sampling of the unlawful acts Defendants have committed in furtherance of their predatory scheme as outlined herein above:

*MHT GROUP, INC.*

62.    On November 14, 2023, a driver working within the course and scope of his employment with Plaintiff MHT parked at a lot operated by Defendant S-Line, located at 5510 East Shelby Drive in Memphis, Tennessee.

63.    Shortly after the MHT driver parked, Defendant S-Line contacted Defendant Cathey and/or CAC (at the time doing business as A-1's Towing), to come to the lot and tow Plaintiff's vehicle.

64.    Employees of Defendant Cathey and CAC proceeded to illegally and unlawfully boot Plaintiff's vehicle.

65.    Upon realizing what was happening, MHT's driver asked how much it would cost to have the boot removed.

66.    In direct violation of state law and ordinances of the City of Memphis, employees of Defendant Cathey and CAC claimed that they could not remove the boot and would need to immediately proceed with towing Plaintiff's vehicle.

67.    When MHT's driver then asked how much the tow would cost, employees of Defendant Cathey and CAC claimed that they would be unable to tell how much until the MHT vehicle was placed in A-1's Towing's storage yard.

68.    Employees of Defendant Cathey and CAC proceeded to illegally and unlawfully hook their wrecker up to the MHT vehicle.

69.    During this interaction, the employees of Defendant Cathey and CAC were armed with weapons and made a point to try to intimidate the MHT driver.

70.    Plaintiff's driver contacted MHT for further instructions. Under the circumstances and in light of the blatant intimidation and extortion tactics being used by the employees of Defendant Cathey and CAC, MHT told its driver to remain inside the vehicle for his safety and contact the Memphis Police Department.

71.    However, because the MHT vehicle was on private property, the Memphis Police Department advised Plaintiff's driver that they were unable to resolve the altercation.

72.     In an effort to diffuse the situation and clear up any issues with the boot dispute until matters could be fully resolved, Plaintiff MHT specifically purchased a two (2) day parking pass through Defendant S-Line's electronic payment system in the amount of $15.87 for its driver/vehicle.

73.     Following the phone call to Memphis Police and after confirmation of the purchase of the parking pass, MHT's driver then attempted to sleep in the truck's sleeper berth.

74.     Despite having evidence and knowledge of Plaintiff's parking pass purchase and lawful right to be on the premises, employees of Defendant Cathey and CAC left the MHT vehicle hooked to their wrecker.

75.     The same employees then attempted further tactics of assault and intimidation, beginning to continuously honk their horns and deliberately "rock" the MHT tractor so as to prevent the MHT driver from sleeping and force/harass him out of the tractor, and for all intents and purposes, holding both the MHT driver and vehicle hostage.

76.     MHT's driver, fearful for his safety, again contacted the Memphis Police. This time the police did come to the scene and ordered the employees of Defendant Cathey and CAC to cease their honking and rocking of the MHT tractor.

77.     Upon information and belief, the Memphis Police stayed on the S-Line lot for approximately four (4) hours. However, as soon as the police left the scene, employees of Defendant Cathey and CAC resumed their threats and intimidation of MHT's driver by again continuously honking their horns and

deliberately rocking the MHT tractor to try to force the MHT driver to exit the vehicle's cab, while continuing to leave the MHT vehicle hooked up to the Defendant's wrecker, thus again holding both driver and vehicle hostage.

78.    The following morning, MHT, attempting to extricate its driver and vehicle from the dangerous situation created by the Defendants, offered to pay Defendants $7500.00 to release them. Defendants refused MHT's coerced offer and attempted to extort even more money from the Plaintiff.

79.    MHT's driver again reached out to the Memphis Police as well as the Shelby County Sherriff's Office and requested their help. When that failed, MHT's driver then contacted the Tennessee Highway Patrol.

80.    When the Tennessee Highway Patrol offices reached the S-Line property, approximately half of the armed "A-1's Towing" employees immediately fled the scene.

81.    The Tennessee Highway Patrol then demanded the employees of Defendant Cathey and CAC, operating as "A-1's Towing" remove the illegally placed boot from MHT's vehicle.

82.    Those same employees then claimed that they had "lost the key."

83.    At this point, the Tennessee Highway Patrol officers permitted MHT to cut off the boot themselves.

84.    Just five (5) days later, on November 19, 2023, Plaintiff MHT and its driver paid for parking at a Capital Fuels truck stop located in West Memphis, Arkansas.

85.    Unbeknownst to Plaintiff MHT at the time, Capital Fuel's parking at that site was operated by Defendant S-Line.

86.    Again, however, despite Plaintiff lawfully paying to park its vehicle at that location through Defendant S-Lines directed electronic payment system, Defendant S-Line contacted Defendant Cathey and CAC (which was again operating as "A-1's Towing"), identifying MHT's vehicle and driver as a target.

87.    Once again, employees of Defendant Cathey and CAC promptly proceeded to illegally and unlawfully boot MHT's vehicle, despite knowing that MHT and its driver were lawfully parked at that location.

88.    This time, when MHT's driver attempted to find out how much Defendants purportedly "required" to remove the illegally placed boot, the Defendants demanded an unlawful and exorbitant $2,800.00 for its removal.

89.    MHT requested an itemized invoice for the purported "charges."

90.    Defendants refused to provide such an invoice until after MHT paid the extortion in full.

91.    MHT, in light of its experience with the Defendants just days earlier, in an effort to mitigate its potential damages and protect its driver and vehicle, promptly transferred the extorted $2,800 by wire to "A-1's Towing".

92.    Only after receiving the wire for $2800 did Defendants finally produce an "invoice" to MHT.

93.    As a direct and proximate result of the Defendants' outrageous acts and illegal conduct, Plaintiff MHT sustained thousands of dollars in downtime/loss of use of its vehicle, as well as additional damages and injuries

sustained as a result of Defendants' unlawful misconduct toward the Plaintiff and its drivers.

*Church Transportation & Logistics, LLC*

94.    On or about October 21, 2023, a driver working within the course and scope of his employment for Plaintiff CTL lawfully parked at a facility operated by Defendant S-Line, located at Lamar Avenue in Memphis, Tennessee.

95.    Again, however, despite Plaintiff lawfully paying to park its vehicle at that location, Defendant S-Line contacted Defendant Cathey and CAC (which was again operating as "A-1's Towing").

96.    The CTL driver was sleeping in the tractor when he was awakened by employees of Defendant Cathey and CAC attempting to boot the Plaintiff's vehicle.

97.    When the CTL driver protested, he was told he had twenty minutes to make payment for the boot or he would be towed.

98.    In response to the unlawful extortion and intimidation by the Defendants' employee(s), the CTL driver attempted a credit card transaction for the demanded amount, but the charge failed to process.

99.    CTL again requested to pay the extorted amount claimed as "owed" by the Defendants, but Defendants refused and instead unlawfully and illegally towed CTL's vehicle from the premises.

100.    Defendants Cathey and CAC, under the assumed name of "A-1s Towing," then demanded unlawful and exorbitant $4,550 in "towing fees," while

refusing to provide an itemized invoice for such alleged "fees" until the $4,550 was paid in full.

101.   After paying the extorted ransom of $4,550 by wire, Defendants Cathey and CAC, as "A1's Towing," finally provided an "invoice."

102.   Just six (6) days later, on October 27, 2023, another CTL driver unwittingly parked at a different S-Line operated and/or managed location, this time an unmanned and unposted lot located at 5510 East Shelby Drive in Memphis, Shelby County, Tennessee.

103.   In accordance with its ongoing unlawful and illegal pattern of misconduct, S-Line had employees monitoring the lot and promptly notified Defendants Cathey and CAC after the CTL driver parked.

104.   The CTL driver, meanwhile, had gone to sleep in the tractor and, like the other CTL driver, awoke to find employees of Defendant Cathey and CAC attempting to boot the Plaintiff's vehicle.

105.   As before, the Defendants attempted to extort a large sum of money, well above the lawful limit, from the CTL driver and told her she had just twenty (20) minutes to pay them the money.

106.   Despite the Defendants' attempts to intimidate, harass, and extort the CTL driver, the Plaintiff's driver was unable to come up with the demanded money in such a short time frame.

107.   Employees of Defendant Cathey and CAC, acting under the assumed name of "A1's Towing," then illegally booted and towed CTL's vehicle with the CTL driver on the scene.

108. Following the illegal booting and tow of the CTL vehicle to the "storage facilities" owned and operated by Defendant Cathey and CAC, Defendants demanded the unlawful and exorbitant fee of $12,950.00, while once again refusing to provide an itemized invoice for the purported charges.

109. CTL eventually paid the extorted ransom of $12,950.00 for the return of its vehicle via wire.

110. Only after receiving the ransom did the Defendants finally provide the requested and required "invoice," but this time *added* additional charges for an extra $1,000.00 in an effort to further intimidate, harass, and extort monies from CTL. (*See* Ex. 6.)

111. As a direct and proximate result of the Defendants' outrageous acts and illegal conduct, Plaintiff MHT sustained thousands of dollars in downtime/loss of use of its vehicle, as well as additional damages and injuries sustained as a result of Defendants' unlawful misconduct toward the Plaintiff and its drivers.

*Western Express, Inc.*

112. On August 31, 2023, a driver for Plaintiff Western Express pulled into a truck stop located at 5510 East Shelby Driver in Memphis, Tennessee to allow Plaintiff's trainee-driver to use the restroom. The actual driver of the Western Express vehicle remained in the cab while the vehicle was lawfully parked as an invitee of the truck stop.

113. Defendant S-Line immediately notified employees of Defendant Cathey and CAC to come to the premises, and within mere moments, those

employees illegally and unlawfully booted Plaintiff's vehicle with Plaintiff's driver still in the truck.

114.   The employees of Defendant Cathey and CAC did not identify themselves before booting the Plaintiff's vehicle, but instead attempted to intimidate, harass, and extort Plaintiff's driver, demanding an immediate and unlawful "payment" of $272.95 to remove the illegally placed boot.

115.   Plaintiff's driver, attempting to deescalate the situation, immediately made arrangements to pay the Defendants by credit card.

116.   However, once the ransom was paid, the Defendants nevertheless illegally towed the Plaintiff's vehicle from the premises.

117.   Plaintiff's driver was forced to pay for transportation from 5510 East Shelby Drive to the Defendant's storage facility, where he was also forced to wait approximately nine (9) hours while Plaintiff Western Express paid additional ransom monies to "A-1's Towing" to retrieve the vehicle. Again, Plaintiff Western Express was forced to pay before receiving an invoice from the Defendants to support the alleged "charges."

118.   That same day, another driver for Plaintiff Western Express lawfully parked in a different location operated by Defendant S-Line.

119.   As with the previously described examples, Defendant S-Line notified employees of Defendant Cathey and CAC to come to the premises, and within mere moments, those employees illegally and unlawfully booted Plaintiff's vehicle with Plaintiff's driver still in the truck.

120.   In this occurrence, those employees were armed with guns and wearing bulletproof vests. They banged on the driver's window and attempted to otherwise intimidate Plaintiff's driver.

121.   Plaintiff's driver, fearing for their safety, exited the Western Express vehicle and allowed the Defendants to illegally tow it from the premises. The driver, meanwhile, contacted Plaintiff and was forced to take hired transportation to a local hotel and stay overnight while Plaintiff attempted to ransom its vehicle.

122.   Again, Plaintiff Western Express was forced to pay before receiving an invoice from the Defendants to support the alleged "charges."

123.   Plaintiff was forced to pay exorbitant and unlawful fees in the amount of $4,375.00 for the release of the two tractor-trailers illegally towed by the Defendants.

124.   Once again, it was not until the ransom was paid that Western Express received the requested "invoice" for the alleged "charges".

125.   Later, on October 31, 2023, another driver for the Plaintiff parked behind a convenience market on E. Shelby Drive in Memphis, Tennessee, not aware that this unmanned lot was similarly operated by Defendant S-Line.

126.   At approximately 9:00 a.m., after being contacted by Defendant S-Line, employees of Defendants Cathey and CAC banged on the window of Plaintiff's vehicle.

127.   Plaintiff's driver looked out the window and saw two (2) tow vehicles and a pickup truck, which upon information and belief were all owned by and

being used within the course and scope of the Defendants' enterprise, to illegally and unlawfully boot every vehicle on the lot.

128.   Defendants' employees did not identify themselves, and they were not wearing any identifying vests, uniforms or badges.

129.   Defendants' employees, through the use of intimidation and harassment, then attempted to extort money from Plaintiff's driver in the amount of $272.95 to remove the boot they had illegally placed on Plaintiff's vehicle.

130.   When Plaintiff's driver could not pay the ransom demanded, Defendant's employees then attempted to disconnect the airlines on Plaintiff's vehicle to hold it hostage until Plaintiff and/or its driver paid the demanded monies.

131.   When Plaintiff's driver objected, Defendants' employees physically assaulted and battered Plaintiff's driver, violently shoving him to the ground before illegally hijacking Plaintiff's vehicle and towing it to one of Defendants' storage facilities.

132.   Again, Plaintiff Western Express was forced to pay Defendants, specifically in the amount of $2,300.00, before receiving an invoice to support the alleged "charges."

133.   In another example, on or about February 18, 2024, a driver for Plaintiff Western Express, parked at a Speedway trucking service station located at 4302 E. Shelby Drive in Memphis, Shelby County, Tennessee.

134.   Unbeknownst to Plaintiff or its driver, this location was monitored and/or managed by Defendant S-Line.

135.    Although the parking site was posted with a sign directly indicating that it was for "24-hour parking," Defendant S-Line contacted the other Defendants and arranged for the vehicle to be towed.

136.    When Plaintiff's driver requested an invoice for the purported charges, Defendants Cathey and CAC, operating under the assumed alias of "A1s Xclusive Auto," refused to provide one.

137.    When Plaintiff's driver requested that the vehicle be released, Defendants Cathey and CAC, operating under the assumed alias of "A1s Xclusive Auto"/"A1's Towing and Hauling," delayed and refused to release the vehicle that day in order to run up "storage charges," claiming that despite the fact that Defendants were clearly open and conducting business, it was a holiday.

138.    Defendants stated that they would not release the Plaintiff's vehicle until Plaintiff paid the exorbitant fee of $2,525.00.

139.    Again, Plaintiff Western Express was forced to pay the Defendants, specifically in the amount of $2,525.00, paid by wire on or about February 20, 2024, in order to obtain Plaintiff's vehicle.

140.    In another instance on the same weekend, another driver for the Plaintiff Western Express had his vehicle targeted and unlawfully towed from another Shelby County location by Defendants Cathey and CAC, who again were operating under the assumed alias of "A1s Xclusive Auto"/"A1's Towing and Hauling."

141. As with the prior instance the same weekend, when Plaintiff's driver requested an invoice for the purported charges, Defendants refused to provide one.

142. When Plaintiff's driver requested that the vehicle be released, Defendants Cathey and CAC, operating under the assumed alias of "A1s Xclusive Auto"/"A1's Towing and Hauling," delayed and refused to release the vehicle that day in order to run up "storage charges," claiming that despite the fact that Defendants were clearly open and conducting business, it was a holiday.

143. Defendants stated that they would not release the Plaintiff's vehicle until Plaintiff paid another exorbitant fee, this time of $3,101.00.

144. Again, Plaintiff Western Express was forced to pay the Defendants, specifically in the amount of $3,101.00, paid by wire on or about February 20, 2024, in order to obtain Plaintiff's vehicle.

145. Multiple other substantially similar incidents occurred in which the Defendants predatorily targeted Plaintiff Western Express's vehicles both within the State of Tennessee and the State of Mississippi, including, *inter alia*, unlawful booting, towing, and/or "storage" of Plaintiff's vehicles in violation of the applicable laws on:

     a. January 20, 2024, when Defendants predatorily targeted, unlawfully booted and proceeded to tow Plaintiff's tractor trailer from 4782 Cayce Road in Byhalia, Mississippi to Memphis, Tennessee, using the alias of "A1's Towing & Hauling," charging Plaintiff $3,175.00 in unlawful, extortionate charges; and

b. January 31, 2024, when Defendants predatorily targeted, unlawfully booted and proceeded to tow Plaintiff's tractor trailer from an Exxon Gas Station located at 8271 US-72 in Byhalia, Mississippi to Memphis, Tennessee using the alias of "A1's Towing and Recovery," charging Plaintiff $2,900.00 in unlawful, extortionate charges.

146. As a direct and proximate result of the Defendants' outrageous acts and illegal conduct, Plaintiff Western Express sustained thousands of dollars in downtime/loss of use of its vehicle, as well as additional damages and injuries sustained as a result of Defendants' unlawful misconduct toward the Plaintiff and its drivers.

*Other examples of Defendants' unlawful enterprise/scheme*

147. As further evidence of the Defendants' unlawful enterprise and conspiracy to extort and defraud commercial transportation companies and their drivers, Defendants' ongoing pattern of outrageous, reprehensible and malicious misconduct has been well-reported over the past year. For example, upon information and belief:

a. On or around September of 2023, the owner of a Shell truck stop located along I-40 in Fayette County, Tennessee, was reportedly granted an emergency injunction to prohibit Defendant S-Line and "A1's Towing and Hauling" from his property after multiple, repeated instances of the Defendants illegally booting and towing 18-wheelers

caused substantial harm to the business and its commercial truck
driver customers.

b. The City of Memphis began an investigation into the predatory
practices of "A1's Towing and Hauling" after receiving nearly a dozen
complaints from commercial truck drivers across the country over
the past year, and in so doing, the Memphis Transportation
Commission found, *inter alia*, in relevant part, that the Defendant(s)
were acting in violation of Memphis City Ordinance No. 5133,
Section 41-6; Memphis City Ordinance No. 5818, Section 41-51(a),
were "continually overcharge[ing] for booting fees in violation of
[Memphis} City Ordinance No. 5679, Section 41.5-8(c), and were
also in violation of Tenn. Code. Ann. 47-18-3203(a)(2) for failing to
issue appropriate invoices and bills. The Memphis Transportation
Commission subsequently suspended the tow permit and booting
permit for "A-1 Xclusive Auto AXA, LLC – d/b/a A-1 Towing and
Hauling" as a result of these ongoing illegalities.

c. The Tennessee Attorney General's Division of Consumer Affairs has
similarly received numerous complaints against "A1's Towing and
Hauling" since 2002.

d. Since 2022, at least five (5) employees of Defendants Cathey and/or
CAC (primarily under the guise of "A-1's Towing and Hauling"), and
at least one employee of Defendant S-Line have been arrested in
separate cases involving the illegal towing of commercial tractor-

trailers. In one of these incidents, an employee of Defendants Cathey and/or CAC was charged with robbery, and in another, three (3) other employees were charged with carjacking for allegedly taking the vehicles by force.

e.   Similarly, Defendants Cathey and/or CAC, operating under the assumed/fictitious name of "A-1's Towing and Hauling," have had their permit to engage in commercial towing services suspended at least twice by two (2) different local governments within the last year, both suspensions arising from substantially the same course and pattern of outrageous and unlawful misconduct giving rise to this Complaint with no corresponding change in the Defendants' ongoing unlawful enterprise/schemes.

f.   Upon information and belief, Defendants have conspired to and engaged in such illegal and predatory conduct throughout the States of Arkansas, Tennessee and Mississippi since at least 2022, and have persisted in their ongoing scheme to intimidate and defraud the Plaintiffs, Plaintiffs' drivers, and the motoring public in general using the same or substantially similar outrageous misconduct through the present date.

## CAUSES OF ACTION

### COUNT 1
### VIOLATION(S) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(a)-(d)
### (ALL DEFENDANTS)

148.   Plaintiffs incorporate by reference each of the preceding paragraphs and allegations therein as if fully set verbatim.

149.   The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 *et seq.*, makes it unlawful, *inter alia* for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

150.   Similarly, RICO prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

151.   Likewise, RICO further prohibits "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce," and goes on to specify that it is also "unlawful for any person to conspire to violate" any of the provisions of 18 U.S.C. § 1962. *See generally,* 18 U.S.C. § 1962(b) and (d).

152.   Each of the named Defendants to this action, at all times relevant to this Complaint, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because each is capable of holding, and does hold, "a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

153.   In addition, or in the alternative, each of the named Defendants, to the extent they are not presently, or have not been during the relevant time period a legal "person" within the defined terms of 18 U.S.C. § 1961(3), such as in the case of the administratively dissolved Tennessee Limited Liability companies, each of the named Defendants have nevertheless at all times relevant to this Complaint been part of the Defendants' ongoing "enterprise" within the meaning of 18 U.S.C. § 1961(4), which specifically "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

154.   Defendants' acts and conduct as set forth and referenced herein, including specifically those referenced in Paragraphs 34 through 147 above, include multiple acts of "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1).

155.   These "racketeering activities" include, but are not limited to, *inter alia*:

   a. Multiple acts of and threats of robbery and/or extortion in connection with the unlawful and illegal booting and towing of Plaintiffs' vehicles, drivers, and/or cargo while Plaintiffs were

lawfully engaged in interstate commerce, in violation of 18 U.S.C. §§ 1961(1)(A) and 1962;

b.  The unlawful taking and carrying away of Plaintiffs' vehicles and/or cargo, while the same were lawfully engaged in interstate commerce, through means of fraud, deception, intimidation, harassment, extortion, and/or other illegal acts, with the intent to convert the same for their own monetary enrichment, or otherwise receiving Plaintiffs' vehicles and holding them within Defendants' possession, despite knowing the same to have been stolen, in violation of both 18 U.S.C. § 659 and 18 U.S.C. §§ 1961(1)(B) and 1962;

c.  Engaging in multiple "extortionate credit transactions" as that phrase is defined and interpreted pursuant to federal law and the provisions of 18 U.S.C. §§ 891-894, by engaging in acts which themselves include, but are not limited to, the unlawful and illegal towing and subsequent holding and storage of the Plaintiffs' vehicles and/or cargo through the use of fraud, deception, intimidation, harassment, extortion, and/or other criminal means, and the use of such unlawful conduct, intended by the Defendants to directly or indirectly threaten Plaintiffs, their agents, representatives and/or employees with actual or potential harm to their persons, reputations, and/or property in the event Defendants' extortionate fees for such towing and/or storage of Plaintiffs' property were not

paid, in violation of 18 U.S.C. §§ 892(b), 894(a)(1)-(2), 1961(1)(B) and 1962;

d.  Engaging in multiple instances of mail fraud, in which Defendants knowingly and intentionally deposited or caused to be deposited certain fraudulent "invoices" and/or other documents with the U.S. Postal Service, private or other commercial interstate mail carrier(s), intending such materials to be delivered to the Plaintiffs and/or other members of the general public, for the purpose of executing their enterprise of unlawfully swindling money from such entities/individuals for the Defendants' benefit, in violation of 18 U.S.C. § 1341 and 18 U.S.C. §§ 1961(1)(B) and 1962;

e. Engaging in multiple instances of wire fraud, in which Defendants knowingly and intentionally, through means of false and fraudulent pretenses, intimidation, harassment, extortion and/or other criminal means, transmitted and/or caused to be transmitted both writings and monies to and from the Plaintiffs, Plaintiffs' drivers and/or other representatives of the Plaintiffs, and/or other members of the general public, for the purpose of executing their enterprise of unlawfully swindling and obtaining money from such entities/individuals for the Defendants' benefit, and executed such acts through means of interstate transmission of such wires of monies/documents, in violation of 18 U.S.C. § 1343 and 18 U.S.C. §§ 1961(1)(B) and 1962;

f.  Engaging in the multiple attempts and conspiracy to attempt multiple instances of mail and/or wire fraud, as more particularly set forth herein, in violation of 18 U.S.C. § 1349 and 18 U.S.C. §§ 1961(1)(B) and 1962;

g.  Engaging in multiple instances of interference with interstate commerce through the use of threats, violence, extortion, intimidation, and/or other criminal and unlawful acts, or otherwise engaging in the attempt or conspiracy to so interfere with interstate commerce through such unlawful means, in violation of 18 U.S.C. § 1951 and 18 U.S.C. §§ 1961(1)(B) and 1962;

h.  Engaging in multiple instances of interstate travel, including into the States of Arkansas and Mississippi, and/or the use of mail in interstate commerce, with the intent to:

   i.  commit the unlawful activities described and referred to in more particularity herein, including but not limited to those referred to in Paragraphs 34 through 147 above; and/or

   ii.  otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the unlawful activities described and referred to in more particularity herein, including but not limited to those referred to in Paragraphs 34 through 147 above, in violation of 18 U.S.C. § 1952 and 18 U.S.C. §§ 1961(1)(B) and 1962; and/or

i.  Engaging in other unlawful, illegal, or criminal activities as may be more fully revealed by discovery in this cause.

156.  Defendants' acts and conduct as set forth and referenced herein, including but not limited to those described in Paragraphs 34 through 147 above, include multiple predicate acts of "racketeering activity" occurring since at least 2022.

157.  Upon information and belief, each of the specific examples of racketeering activity by the Defendants as described herein were not isolated incidents, but rather part of a large number of related and ongoing incidents whereby the Defendants have, or have attempted to, through substantially similar tactics/means, extort unlawful sums of monies from not only the Plaintiffs but also the general public, including but not limited to other commercial transportation and logistics providers operating within the States of Arkansas, Mississippi and Tennessee throughout the time period of at least 2022 through the present.

158.  Upon information and belief, Defendants' racketeering activity, as set forth and referenced herein, both against the Plaintiffs and the general public, remains ongoing to date.

159.  Defendants' association with each other, and their engagement in the acts, conduct, and conspiracy to commit such acts/conduct as more fully set forth herein, including but not limited to those described in Paragraphs 34 through 147 above, constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4).

160.  Defendants' acts and conduct as set forth and referenced herein, including but not limited to those described in Paragraphs 34 through 150 above, constitutes a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5).

161.  More particularly, as outlined in greater detail herein, this unlawful enterprise/scheme of racketeering activity by the Defendants ("the Enterprise") was initially funded in whole or in part by Defendants Cathey, CAC and S-Line.

162.  Defendants Cathey, CAC and S-Line facilitated the Enterprise by purposefully identifying, selecting, and arranging for "parking" and "security" services to be provided to third-party businesses, with the intended conspiratorial purpose of using such "services" as a ruse for the implementation the enterprise/scheme as set forth more particularly herein.

163.  Defendant S-Line facilitated the Enterprise by purposefully entering into contracts with one or more third-party businesses/entities for the leasing of certain open areas and/or parking lots owned, leased, or otherwise controlled by these third-party businesses/entities for the provision of "parking" and/or "security" services.

164.  These open areas and/or parking lots were directly identified, selected, and specifically targeted by Defendant S-Line for their location in and adjacent to areas known to be frequented by commercial truck drivers who were engaged in interstate commerce.

165.  Once it had successfully negotiated such contracts/leases with the third-party businesses/entities, Defendant S-Line then purposefully created an

environment specifically designed to "lure" commercial truck drivers, including but not limited to the Plaintiffs and Plaintiffs' drivers, to these locations and induce the drivers to park in those locations.

166.   Once an unsuspecting commercial driver parked his vehicle in the S-Line operated area/lot, and regardless of whether the commercial driver paid any indicated/posted fee to park there, Defendant S-Line, who would monitor such areas/lots through the use of electronic cameras, recording devices, or surreptitiously concealed persons, would contact the other Defendants, including specifically Defendants Cathey and/or CAC (whether directly or through one of CAC's assumed/fictitious alter egos), identify the commercial driver and his/her vehicle as a potential target, and direct the remaining Defendants to come to the area/lot to enact the rest of the scheme.

167.   Upon information and belief, Defendant S-Line, having secured a potential "target" and contacted Defendants Cathey and/or CAC (whether directly or through one of CAC's assumed/fictitious alter egos) to come to the scene, would further attempt to unlawfully prevent the target from leaving the premises until one or more of the other Defendants arrived.

168.   Upon arriving to the location of the "target," Defendants Cathey, CAC (whether directly or through one of CAC's assumed/fictitious alter egos), and/or John Does 1-10, then proceeded to use harassment, intimidation, violence and/or the threat of violence, ad other illegal means to extort unlawful sums of money from the commercial drivers and/or their employers, including but not limited to each of the Plaintiffs and the general public, through the

utilization of, *inter alia,* the unlawful "booting," towing, and/or theft of the Plaintiffs' vehicles and cargo.

169.   Upon information and belief, while Defendant S-Line would directly receive, via electronic means, monies from the targeted commercial drivers and/or their employers from the "parking" portion of the Enterprise, Defendant S-Line would subsequently funnel some portion of such monies, again by means of wire or other electronic means, to one or more of the other Defendants, particularly Defendant Cathey.

170.   Similarly, upon information and belief, while Defendant CAC would directly receive, via wire or other electronic means, monies from the Plaintiffs and other employers/representatives of the targeted commercial drivers for the unlawful booting, towing, and/or storage of the Plaintiffs' vehicles, generally while using the alter ego/alias of "A-1's Towing" and/or "A1's Towing and Hauling," Defendant CAC would subsequently funnel some portion of the unlawfully obtained monies to Defendant S-Line and/or Defendant Cathey, while funneling all or some portion of the remainder of the funds into the purchase of property, equipment, and other tangible and intangible assets purportedly held by one or more of the remaining Defendants in an effort to further support the ongoing Enterprise.

171.   Upon information and belief, each of the Defendants engaged the Enterprise in direct violation of multiple local, state, and federal laws throughout the States of Arkansas, Tennessee and Mississippi during the time referenced herein, including but not limited to the years of 2022 through the present.

172.    Defendants acted in common concert and conspired to illegally and/or criminally defraud, extort, and steal from Plaintiffs, Plaintiffs' drivers/employees, and other members of the general public through the use of the Enterprise and have continued to engage in an ongoing pattern of such unlawful conduct through the present day, even despite the efforts of local law enforcement to curtail these unlawful activities.

173.    Upon information and belief, each of the Defendants engaged and continue to engage in the Enterprise in order to receive unlawful financial gain for their own private purposes, and have, during the relevant time period of 2022 through the present, used at least some portion of the unlawfully obtained monies received as a result of the Enterprise to fund, purchase, acquire, and/or maintain equipment, properties, and or other tangible and/or intangible assets held, individually or collectively, by Defendants Cathey, CAC (or one of CAC's assumed/fictitious alter egos), and/or S-Line.

174.    As a direct and proximate result of the Defendants' outrageous acts and illegal conduct, Plaintiffs have sustained thousands of dollars in downtime/loss of use of their vehicles, the loss of their reputation and goodwill, as well as additional and consequential damages and injuries sustained as a result of Defendants' unlawful misconduct toward the Plaintiffs and their drivers.

175.    In accordance with the provisions of 18 U.S.C. § 1964(c), Defendants unlawful and outrageous acts as set forth herein entitles Plaintiffs to damages, including but not limited to threefold the amount of compensatory, actual and

consequential damages incurred, their reasonable attorneys' fees and costs incurred in the bringing of this action, and other damages as permitted by law.

## COUNT II –
## WIRE FRAUD 18 U.S.C. § 1343 (ALL DEFENDANTS)

176. Plaintiffs incorporate by reference each of the preceding paragraphs and allegations therein as if fully set verbatim.

177. Pursuant to 18 U.S.C. § 1343, it is unlawful for any person or entity, having devised or intending to devise any scheme or artifice to defraud, for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme. 18 U.S.C. § 1343.

178. As described in Paragraphs 34 through 147 above, Defendants Cathey, CAC (including under CAC's assumed/fictitious aliases), S-Line, and John Does 1-10, engaged in actual wire fraud and the conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 by, *inter* alia:

  a. knowingly creating, sending, and transmitting fraudulent "invoices" to be delivered to the Plaintiffs via electronic mail related to the illegal and unlawful booting and towing of the Plaintiffs' vehicles;

  b. knowingly creating electronic "apps" and websites for the collection of "parking fees" from the Plaintiffs and other members of the general public with the intent to defraud;

  c. conspiring to lure commercial truck drivers and their employers into utilizing electronic "apps" and/or websites for the electronic

payment of "parking fees" from the Plaintiffs and other members of the public with the intend to defraud;

d.  requiring and otherwise accepting fraudulent electronic payments, including through the use of QR Codes, credit cards, banking wires, and other forms of electronic payments for fraudulent, unlawful, and/or illegal booting, towing, and/or "storage fees" from the Plaintiffs and other members of the public;

e.  engaging in, or conspiring to engage in the creation and/or transmission of fraudulent "invoices" related to the Plaintiffs and/or other members of the general public related to the fraudulent, unlawful, and/or illegal booting, towing, and/or "storage fees" from the Plaintiffs and other members of the public; and/or

f.  other acts as may be more specifically uncovered during the discovery of this cause.

179.   In addition to those events and acts previously described in Paragraphs 34 through 147 above, Defendants Cathey, CAC (including under CAC's assumed/fictitious aliases), S-Line, and John Does 1-10, engaged in actual wire fraud and the conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 through, *inter alia*, the creation, transmission, and/or receipt of the following non-exclusive list of electronic wires/transmissions:

a.  Invoice No. 29068, dated July 17, 2022, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,130.00;

b.  Invoice No. 30934, dated September 25, 2022, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $1,310.00;

c.  Invoice No. 32251, dated November 14, 2022, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $1,545.00;

d.  Invoice No. 33090, dated December 30, 2022, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $1,410.00;

e.  Invoice No. 35351, dated March 18, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $1,170.00;

f.  Invoice No. 35767, dated March 31, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,830.00;

g.  Invoice dated April 25, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,720.00;

h.  Invoice No. 37439, dated May 19, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,570.00;

i.  Invoice No. 37624, dated May 25, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,550.00;

j.  Invoice No. 37841, dated June 1, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $3,000.00;

k.  Invoice No. 40927, dated August 22, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $3,350.00;

l.  Invoice No. 41320, dated August 31, 2023, sent under the guise of "A1's Towing & Hauling," in the amount of $4,375.00, acknowledging QR payment made to S-Line on August 31, 2023 in

the amount of $265.00, and subsequent wire transfer received from he Plaintiffs on August 31, 2023 in the amount of $4,110.00;

m. Invoice No. 41326, dated September 1, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,800.00;

n. Invoice No. 42226, dated September 24, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,870.00;

o. Invoice No. 43020, dated October 20, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $1,400.50;

p. Invoice No. 43275, dated October 31, 2023, sent under the guise of "A1's Exclusive Auto AXA, LLC," in the amount of $2,300.00;

q. Invoice No. 43931, sent via electronic and/or U.S. Mail by Defendants Cathey and CAC, using the fictitious name of "A1's Towing & Hauling," for unlawful, fraudulent, and extortionate charges in the amount of $2,800.00;

r. Receipt, created and/or transmitted on or about October 21, 2023, sent via electronic and/or U.S. Mail by Defendants Cathey and CAC, using the fictitious name of "A1's Towing & Hauling," for unlawful, fraudulent, and extortionate charges in the amount of $4,550.00;

s. "Impound Invoice" Call # 43192, sent via electronic and/or U.S. Mail by Defendants Cathey and CAC, using the fictitious name of "A1's Towing & Hauling," for unlawful, fraudulent, and extortionate charges in the amount of $13,950.00;

t. "Impound Invoice," Call # 43275, sent via electronic and/or U.S. Mail by Defendants Cathey and CAC, using the fictitious name of "A1's Towing & Hauling," for unlawful, fraudulent, and extortionate charges in the amount of $2,300.00, referencing and confirming wire transfer received for such "charges" on November 1, 2023;

u. Invoice sent by axadispatch@yahoo.com, on behalf of the Defendants to agents/representatives/employees of Plaintiff Western Express via electronic mail on January 20, 2024 in the amount of $3,175.00;

v. Invoice sent by axadispatch@yahoo.com, on behalf of the Defendants to agents/representatives/employees of Plaintiff Western Express via electronic mail on January 21, 2024 in the amount of $2,900.00;

w. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto" and Bank of America, N.A., NY on or about August 31, 2023, in the amount of $4,375.00;

x. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto" and Bank of America, N.A., NY account No. 444022488295, sent under protest by Plaintiff Western Express on January 22, 2024 in the amount of $3,175.00;

y. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto," in the amount of $12,975.00,

paid by and on behalf of Plaintiff CTL on November 1, 2023, to Bank of America, N.A., NY account No. 444022488295;

z. Electronic payment transfer to Defendant S-Line, paid via "ParkWhiz.com" on Wednesday, November 14, 2023, in the amount of $15.87, paid by and on behalf of Plaintiff MHT;

aa. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto," in the amount of $2,800.00, paid by and on behalf of Plaintiff MHT on November 20, 2023, via Chase Platinum Business Checking, Reference No. 1120MMQFMP2N017485, Transaction No. 12001363174;

bb. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto" and Bank of America, N.A., NY account No. 444022488295, sent under protest by Plaintiff Western Express on October 31, 2023 in the amount of $2,300.00;

cc. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto" and Bank of America, N.A., NY account No. 444022488295, sent under protest by Plaintiff Western Express on January 31, 2024 in the amount of $2,900.00;

dd. Wire transfer received by Defendants Cathey and CAC, using the fictitious name of "A1s Xclusive Auto" and Bank of America, N.A., NY account No. 444022488295, sent under protest by Plaintiff Western Express on February 20, 2024 in the amount of $2,525.00;

ee. Wire transfer received by Defendants Cathey and CAC, using the
fictitious name of "A1s Xclusive Auto" and Bank of America, N.A.,
NY account No. 444022488295, sent under protest by Plaintiff
Western Express on February 20, 2024 in the amount of $3,101.00;
and

ff. Other unlawful acts as may be more fully revealed during the
discovery of this cause.

180.   Each incident detailed above constitutes a separate occurrence.

181.   As a direct and proximate result of the Defendants' outrageous acts
and illegal conduct, Plaintiffs have sustained thousands of dollars in
downtime/loss of use of their vehicles, the loss of their reputation and goodwill,
as well as additional and consequential damages and injuries sustained as a
result of Defendants' unlawful misconduct toward the Plaintiffs and their drivers.

182.   In accordance with the provisions of 18 U.S.C. § 1964(c), Defendants
unlawful and outrageous acts as set forth herein entitles Plaintiffs to damages,
including but not limited to threefold the amount of compensatory, actual and
consequential damages incurred, their reasonable attorneys' fees and costs
incurred in the bringing of this action, and other damages as permitted by law.

## COUNT III –
## INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE,
## VIOLATIONS OF 18 U.S.C. § 1951 (ALL DEFENDANTS)

183.   Plaintiffs incorporate by reference each of the preceding paragraphs
and allegations therein as if fully set verbatim.

184.   Pursuant to 18 U.S.C. § 1951, it is unlawful for any person or entity to in any way or degree obstruct, delay, or affect commerce or the movement of any article or commodity in commerce, by robbery, extortion, or any conspiracy to do so, or to otherwise commit or threaten physical violence to any person or property in furtherance of any plan or purpose to do so.  18 U.S.C. § 1951(a).

185.   As described in Paragraphs 34 through 147 above, as well as other acts as may be more specifically revealed during the discovery of this cause, Defendants Cathey, CAC (including under CAC's assumed/fictitious aliases), S-Line, and John Does 1-10, engaged in extortion and the conspiracy to commit extortion of the Plaintiffs while Plaintiffs were lawfully engaged in interstate commerce through the threat of or actual acts of physical violence in direct violation of 18 U.S.C. § 1951.

186.   As a direct and proximate result of the Defendants' outrageous acts and illegal conduct, Plaintiffs have sustained thousands of dollars in downtime/loss of use of their vehicles, the loss of their reputation and goodwill, as well as additional and consequential damages and injuries sustained as a result of Defendants' unlawful misconduct toward the Plaintiffs and their drivers.

187.   In accordance with the provisions of 18 U.S.C. § 1964(c), Defendants unlawful and outrageous acts as set forth herein entitles Plaintiffs to damages, including but not limited to threefold the amount of compensatory, actual and consequential damages incurred, their reasonable attorneys' fees and costs incurred in the bringing of this action, and other damages as permitted by law.

## COUNT IV –
## FRAUD (ALL DEFENDANTS)

188.   Plaintiffs incorporate by reference each of the preceding paragraphs and allegations therein as if fully set verbatim.

189.   As described in Paragraphs 34 through 147 and Paragraphs 178-179 above, as well as other acts as may be more specifically revealed during the discovery of this cause, Defendants Cathey, CAC (including under CAC's assumed/fictitious aliases), S-Line, and John Does 1-10, *inter alia*;

    a. Fraudulently represented areas as available for paid parking or free parking areas, with the intent to lure and predatorily target commercial truck drivers, such as those employed by the Plaintiffs, to such areas;

    b. Fraudulently misrepresented Defendants' authority and legal right to boot, tow and/or store Plaintiffs' vehicles and other such similar commercial motor vehicles, while knowingly engaging in such activities in violation of, among others, the laws of the State of Tennessee and the applicable ordinances of the City of Memphis;

    c. Fraudulently misrepresenting the maximum legal amount(s) permissible to be charged for booting, towing and/or storing Plaintiffs' vehicles and other such similar commercial motor vehicles, in knowing and intentional violation of, among others, the laws of the State of Tennessee and the applicable ordinances of the City of Memphis; and/or

d. Other acts as may be more particularly revealed during discovery in this cause.

190. Defendants' statements and misrepresentations as set forth herein were made by the Defendants in a knowing and reckless disregard for the truth and legality of such statements, in knowing and intentional violation of, among others, the laws of the State of Tennessee and the applicable ordinances of the City of Memphis.

191. As a direct and proximate result of the Defendants' intentional fraud, Plaintiffs have sustained damages as more fully set forth herein.

## COUNT V –
## VIOLATIONS OF TENNESSEE TOWING STATUTES (ALL DEFENDANTS)

192. Plaintiffs incorporate by reference each of the preceding paragraphs and allegations therein as if fully set verbatim.

193. T.C.A. § 55-16-111 provides, in relevant part, that it is unlawful for any vehicle to be towed without authorization by the vehicle's owner until twelve (12) hours have elapsed since it was first observed to be immobile or unattended.

194. As described in Paragraphs 34 through 147 above, as well as other acts as may be more specifically revealed during the discovery of this cause, Defendants intentionally and systematically targeted Plaintiffs' vehicles, as well as those of other commercial vehicles, and towed those vehicles in direct violation of Tennessee law in furtherance of their scheme to entrap, extort, and defraud owners of such vehicles.

195. Upon information and belief, and as described in Paragraphs 34 through 147 above, as well as other acts as may be more specifically revealed

during the discovery of this cause, Defendants further violated the provisions of T.C.A. § 55-16-112(a), which requires, in relevant part, that Defendants first obtain "an express written authorization for towing and storage of each vehicle from a law enforcement officer with appropriate jurisdiction, or from the owner of the vehicle, or from the owner, or the authorized agent of the owner, of the private property from which the vehicle is to be towed," and committed such violations in direct violation of Tennessee law in furtherance of their scheme to entrap, extort, and defraud owners of such vehicles.

196.  T.C.A. § 55-16-113 provides, in relevant part, that it is unlawful for any towing company to "make, confer, or offer any payment or any other pecuniary benefit to an owner or manager of property from which the firm has towed a vehicle with the intent of rewarding the owner or manager for referring the vehicle for towing," nor may "an owner or manager of property from which a towing firm has towed a vehicle ... solicit or receive any payment or other pecuniary benefit from a towing firm in exchange for referring a vehicle for towing to the firm."

197.  As described in Paragraphs 34 through 147 above, as well as other acts as may be more specifically revealed during the discovery of this cause, Defendants Cathey and CAC, through the use of one or more of their fictitious alter egos, assumed names, or aliases, including but not limited to *inter alia,* "A1's Xclusive Auto AXA, LLC," "A-1's Towing and Hauling, LLC" "A-1s Xclusive Auto," "A1's Car Hauling, LLC," conspired with Defendants S-Line and one or

more of the Defendants referred to herein as John Does 1-10, in deliberate and intentional purpose to violate T.C.A. § 55-16-113.

198.   As a direct and proximate result of the Defendants' unlawful acts, Plaintiffs have sustained damages as more fully set forth herein.

**COUNT VI –
VIOLATIONS OF THE TENNESSEE BOOTING CONSUMER PROTECTION ACT, T.C.A. § 47-18-3201 *ET SEQ.* AND TENNESSEE CONSUMER PROTECTION ACT OF 1977, T.C.A. § 47-18-101 *ET SEQ.* (ALL DEFENDANTS)**

199.   Plaintiffs incorporate by reference each of the preceding paragraphs and allegations therein as if fully set verbatim.

200.   As described in Paragraphs 34 through 147 above, Defendants knowingly and intentionally repeatedly violated or otherwise conspired to violate the Tennessee Booting Consumer Protection Act, T.C.A. § 47-18-3201 *et seq.* by, *inter alia*:

    a.   Refusing to accept credit and debit card payments for the removal of a vehicle immobilization device from a motor vehicle, including but not limited to the Plaintiffs' vehicles, in gross and intentional violation of T.C.A. § 47-18-3203(a)(1);

    b.   Refusing to appropriately and timely bill for the removal of a vehicle immobilization device as required by T.C.A. § 47-18-3203(a)(2);

    c.   Failing to properly post signage on the S-Line managed properties in violation of T.C.A. § 47-18-3203(d)(1)-(2); and

    d.   Other acts as may be more specifically revealed during the discovery of this cause.

201.  Pursuant to T.C.A. § 47-18-3204, each violation of these preceding provisions constitutes a separate violation of the Tennessee Consumer Protection Act of 1977 and is subject to the same penalties and remedies as provided in that act, in addition to the other penalties and remedies established under the Tennessee Booting Consumer Protection Act.

202.  In addition to the foregoing, each of the Defendants violated, and conspired to violate, the prohibitions against unfair or deceptive acts or practices in further violation of the Tennessee Consumer Protection Act of 1977.

203.  As a direct and proximate result of the Defendants' unlawful acts, Plaintiffs have sustained damages as more fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that: (a) each of the Defendants be served with process and compelled to answer the claims set forth herein; (b) that a jury of twelve (12) be empaneled to hear all claims herein for which a jury is permitted, and (c) that judgment be entered against all Defendants for the unlawful acts and violations set forth herein. Plaintiffs further request that this Court award the following damages, jointly and severally against the Defendants, as provided by United States law and Tennessee law, including but not limited to the following:

a.  Compensatory, actual and consequential damages to the Plaintiffs, trebled where permitted by statute, in an amount not to exceed Five Million Dollars ($5,000,000.00);

b.     All costs of this action and all reasonable attorneys' fees incurred by Plaintiffs;

c.     That in the alternative to treble damages authorized by statute, Plaintiffs be awarded punitive damages, in an amount to be set by a jury as permissible by the laws of the United States and the State of Tennessee, and

d.     Any and all further relief, whether such relief sounds in equity or at law, as this Court may deem appropriate.

Respectfully submitted,
**Glassman, Wyatt, Tuttle & Cox, P.C.**

/s/ Robert A. Cox
**ROBERT A. COX (BPR #14279)**
**RONNA D. KINSELLA (BPR# 24549)**
26 N. Second Street
Memphis, Tennessee 38103
(901) 527-4673 – Telephone
(901) 521-0940 – Facsimile
rcox@gwtclaw.com
rkinsella@gwtclaw.com
*Attorneys for Plaintiffs*